IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DAVID S. BURNHAM, | : | Case No. 3:15-cv-00024 |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| ENCAP TECHNOLOGIES, LLC, | : | |
| Defendant. | : | |

---

**ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT (DOC. 24) AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 27)**

---

This case is before the Court on the Partial Motion for Summary Judgment (Doc. 24) filed by Defendant ENCAP Technologies, LLC ("ENCAP") and the Motion for Summary Judgment (Doc. 27) filed by Plaintiff David Burnham ("Burnham"). Burnham and ENCAP have opposed each other's respective motion and the motions are now fully briefed and ripe for review. (Docs. 28, 29, 31, 32.) For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** both ENCAP's Partial Motion for Summary Judgment and Burnham's Motion for Summary Judgment.[1]

I.   BACKGROUND

   1.  **Procedural Background**

On August 9, 2014, Burnham brought this lawsuit against ENCAP in the Court of Common Pleas for Montgomery County, Ohio. (Doc. 1 at 1.) On January 23, 2015, ENCAP removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (*Id.*)

---

[1] The Court acknowledges the valuable contribution and assistance of judicial extern Callum Morris in drafting this opinion.

As alleged in the Complaint, ENCAP employed Burnham as a Senior Chemist in July 2010. (Doc. 3 at ¶ 4.) Burnham alleges that, due to financial difficulties, ENCAP stopped paying him in June 2012 and then terminated his employment in April 2013. (*Id.*) Burnham asserts two claims for relief in the Complaint: (1) failure to pay wages and benefits in violation of Ohio Rev. Code § 4113.15, and (2) breach of contract for (a) termination of his employment without cause and (b) failure to pay three $1 million bonuses allegedly owed under his employment agreement. (Doc. 3 at ¶¶ 12-18.) In addition to damages, Burnham seeks injunctive and declaratory relief on his claims. (*Id.* at p. 7.)

On May 3, 2016, ENCAP filed its Motion for Partial Summary Judgment (Doc. 24) and Burnham filed his Motion for Summary Judgment (Doc. 27), both of which are now before the Court. ENCAP's Motion seeks dismissal of Burnham's claim for unpaid wages for the period from February 1, 2013 through his termination in April 2013 and dismissal of Burnham's breach of contract claim in its entirety. If ENCAP's Motion were successful, Burnham would proceed to trial on only his claim for unpaid wages for the period from June 2012 through February 1, 2013. Burnham seeks summary judgment in his favor on both of his asserted claims in their entirety.

## 2. Factual Background

This summary reflects the facts provided by the parties in support of their respective motions for summary judgment. To the extent that a material fact is disputed, it is noted below.

ENCAP is a Georgia limited liability company that produces coating products for buildings and transportation equipment. (Doc. 24-1 at ¶¶ 5-6.) ENCAP developed a new, patented coating branded as "CoForm," which is produced by processing a specialized hydrolyzed ethylene vinyl acetate ("HEVA") polymer made pursuant to patents owned by

2

ENCAP. (*Id.* at ¶ 7.)

On July 20, 2010, Robert Gist, ENCAP's CEO, hired Burnham to work as a Senior Chemist in ENCAP's Miamisburg, Ohio laboratory. (Doc. 27-16.) On the same day, Gist sent Burnham an offer letter ("Contract"). (*Id.*) The parties agree that the Contract contains the terms of Burnham's employment at ENCAP, although the parties disagree regarding the proper interpretation of those terms. (Doc. 24 at 3; Doc. 27 at 3.) The Contract states, in relevant part:

. . . The details of our offer are as follows:

1. A Senior Chemist position;

2. First year starting salary is $80,000.00;

3. ENCAP will assume your existing monthly health insurance premium;

4. ENCAP will assume the deductibility of your current policy of $1 OK;

5. Consistent with the progress and success that ENCAP anticipates from your lab duties, responsibilities, and meeting ENCAP's objectives, as discussed during your interview with Dr. Gary F. Hillenbrand, and in light of the fact that your position may very well terminate upon ENCAP's sale of its core-technology, ENCAP will pay to you a bonus of $1 million (net of taxes) immediately following this sale. In conjunction with this bonus, you can earn an additional $1 million bonus based upon your level of performance and productivity as determined by Dr. Hillenbrand and myself. This assessment will be made at the sale of ENCAP's core-technology, and if your performance is deemed to be worthy, an additional bonus of $1 million will be paid to you immediately upon the sale of ENCAP's core-technology. If you are successful in establishing that CoForrn (or a second generation coating) can in fact achieve higher\better physical and mechanical properties than CoForrn using its current chemical makeup, then you can earn an additional bonus of $1 million+ as determined by the principals of ENCAP immediately following the sale of ENCAP's core-technology;

6. ENCAP will offer some housing\apartment allowance for the Dayton, OH area so as to avoid securing a lab in the South Bend, Indiana area. This allowance shall amount to $950.00 per month and payable to you monthly, separate and apart from your salary enumerated in Item 2. above;

. . .

3

> In connection with this offer, ENCAP will require you to sign the enclosed "Confidentially & Non-Disclosure Agreement" with respect to ENCAP's proprietary core-technology, related technology, and testing and procedures relating to, touching and concerning this technology.

(Doc. 27-16).  On July 22, 2010, Burnham signed the Confidentiality & Non-Disclosure Agreement referenced in the Contract.  (Doc. 23-1 at 49-50, Ex. C.)  The Confidentiality & Non-Disclosure Agreement included several promises related to the protection, confidentiality, and return of ENCAP's confidential and proprietary information.  (Doc. 23-1, Ex. C.)

In May 2012, ENCAP experienced a "financial crisis" and advised its employees that it no longer had the money to meet payroll.  (Doc. 23-1 at 80; Doc. 23-2 at 247-252, Ex. Q.)  From June 30, 2012 until Burnham's termination on April 30, 2013, ENCAP failed to pay Burnham the compensation that he was owed under his Contract.  (Doc. 23-2 at 250-253, 319-321.)  In August 2014, the ongoing financial crisis at ENCAP forced the company to abandon the Miamisburg lab. (Doc. 23-1 at 68, 77, 187, 256.)  With Gist's authorization, Burnham transferred ENCAP's lab books, equipment, stock of HEVA, and other material to the Dayton office.  (Doc. 27-1; Doc. 23-1 at 77-79.)

In January 2013, a major investor agreed to help ENCAP pay certain past-due bills if Gist resigned as CEO.  (Doc. 23-1 at 163-165.)  Gist resigned as CEO and was replaced by David Elmore in late January 2013.  (*Id.* at 165-166.)  Gist also resigned from ENCAP's Board of Directors, as did Roland Lynch, another ENCAP investor who had been brought into ENCAP by Gist.  (Doc. 27-1 at ¶ 7; Doc. 27-2 at ¶ 4.)  In early February 2013, Gist attempted to rescind his resignation as CEO, but ENCAP did not permit him to do so.  (Doc. 27-1 at ¶ 7.)

In a February 16, 2013 email, Elmore, ENCAP's new CEO, informed Burnham that he expected to receive additional funding for ENCAP within the next week and that some of that

4

funding would be directed to employees who were owed back pay. (Doc. 23-2, Ex. JJ.) Elmore further stated:

> I am giving priority on back payroll payments to those who are indeed on board with us here at new management, so please let me know in writing in an email that you are no longer talking with unit-holder Bob Gist, who is no longer an official at ENCAP. Mr. Gist is not allowed to discuss official business of ENCAP. I'll take your word that you are now on board with new management, if you say so, and I will ensure that you receive some back payroll.

(*Id.*)

In response, Burnham wrote to Elmore that he had not had any contact with Gist since Gist had requested a teleconference—for which Burnham had not been available. (*Id.*) Burnham added: "I remain fully supportive of Encap's new management and committed to the success of our company." (*Id.*) Despite these assurances, Burnham maintained contact with Gist from February 2013 through to the end of his employment with ENCAP on April 30, 2013. (*See* Doc. 24 at 7-8 (citing Burnham deposition transcript and exhibits).)

On March 4, 2013, ENCAP was locked out of its Dayton office for failure to pay rent. (Doc. 28-5; Doc. 23-1 at 144-45, 207.) Elmore contacted the landlord and arranged for Burnham to remove ENCAP property, including lab books and HEVA. (Doc. 25 at 145-35, 163-64; Doc. 27-6.) In a March 29, 2013 email, Elmore informed Burnham that arrangements were in place for him to remove ENCAP property from the Dayton office. (Doc. 27-5.) In the same email, Elmore also informed Burnham that he had been terminated on January 15, 2013, but could re-join ENCAP on certain terms. (*Id.*) Elmore also stated that Burnham would still be able to earn bonuses as set forth in an attached "engagement letter sent to you by Gist in 2010." (*Id.*) In response, Burnham stated that he was "surprised and dismayed" to learn that he had been retroactively terminated "without reason, explanation or justification." (Doc. 28-6.) He

5

informed Elmore that the engagement letter attached to his email was incorrect; Burnham therefore attached a copy of his Contract for Elmore's reference.  (*Id.*)  Elmore responded that he had assumed that Burnham was terminated in January 2013, but recognized his mistake.  (*Id.*)  Elmore agreed to compensate Burnham at his contractual rate through March 31, 2013, and then offered to extend Burnham's contract through April 30, 2013 to determine if ENCAP would be able to retain Burnham going forward.  (*Id.*)  Burnham accepted that offer.  (*Id.*)

In mid-July 2013, Burnham elected to ship approximately thirty pounds of HEVA that he had retrieved from ENCAP's Dayton office to Lynch (the ENCAP investor who had resigned from ENCAP's Board along with Gist), instead of returning it to ENCAP.  (Doc. 23-2 at 343-348, 353-357.)  Burnham testified that he shipped the HEVA to Lynch based on his understanding that it was created using a proprietary process, which Lynch owned, and therefore Lynch had rights to the HEVA.  (Doc. 23-2 at 344-346.)  Lynch ultimately provided the HEVA to ENCAP, after ENCAP demanded its return and filed a motion for a temporary restraining order in Georgia.  (Doc. 24-1 at ¶ 14.)

After Elmore assumed the role of CEO, ENCAP made three lump sum payments totaling $20,000 to Burnham in partial payment for the wages that he was owed:   $7,500 paid on or about March 21, 2013, $7,500 paid on or about June 21, 2013, and $5,000 paid on or about July 5, 2013.  (Doc. 24-1 at ¶ 13.)  Burnham does not dispute that these payments were made, but claims that he is still owed $66,119.90 in unpaid salary, health insurance premiums, and housing allowances.  (Doc. 27 at 1.)  ENCAP further divides the amount of compensation claimed into two periods.  First, for the period prior to February 1, 2013 the compensation is $49,250, while the compensation claimed for the period from February 1, 2013 to April 30, 2013 is $16,869.90.

6

(Doc. 29 at 9.)

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson*, 477 U.S. at 250).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id*. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id*.

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## III. ANALYSIS

### 1. Ripeness of Burnham's Bonus Claims

Burnham alleges that ENCAP is liable for breach of contract, in part, because it has not paid him three $1 million bonuses to which he is allegedly entitled under the Contract. ENCAP argues that the question of Burnham's entitlement to those bonuses is not ripe for review. Both

parties seek summary judgment on this portion of Burnham's breach-of-contract claim.

When this case was still in state court, ENCAP moved for summary judgment on Burnham's breach-of-contract claim on the grounds that it was not ripe for decision under Ohio's Declaratory Judgment Act, Ohio Rev. Code § 2721.02. (Doc. 28 at 17-18.) Denying ENCAP's motion, the state court found that Burnham had presented a justiciable controversy. (*Id.*) After the state court denied ENCAP's motion for summary judgment, Burnham voluntarily dismissed his state court action due to his counsel's health issues. (*Id.* at 3, n. 2.) Burnham then refiled his complaint in state court, and ENCAP timely removed the new action to this Court. (*Id.* at 3.)

Burnham relies on the state court's reasoning in denying ENCAP's motion for summary judgment to oppose ENCAP's ripeness argument before this Court. (Doc. 28 at 17-18.) The state court's decision is not binding on this Court—see *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990), especially in light of Burnham's voluntary dismissal of the action in which it was made. *See Estate of Johnson v. Randall Smith, Inc.*, 989 N.E.2d 35, 39 (Ohio 2013) (action that has been voluntarily dismissed is treated "as if it had never been commenced" under Ohio law). Nonetheless, the Court will consider the state court's reasoning, as it is the only argument presented by Burnham.

On the issue of the bonuses, the state court concluded that there was a justiciable controversy for the following reasons:

> The contract at issue does not specifically state that Plaintiff must be employed at the time the bonus(es) are to be awarded. Further, it does not list whether Plaintiff is an employee at will or that he could only be terminated for cause. Plaintiff has testified that he had to be employed at ENCAP at the time of the sale to receive the bonuses, and that he was entitled to the bonus(es) unless he was fired for cause.

(Doc. 28 at 18.) With due respect, these reasons do not establish that the question of Burnham's entitlement to his contractual bonuses was or is ripe for review.

9

The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbot Laboratories v. Gardner*, 387 U.S. 136, 148 (1967).  The Sixth Circuit employs a three-part test to determine whether a claim is ripe for review:

- First, we examine the "likelihood that the harm alleged by [the] plaintiffs will ever come to pass." *United Steelworkers, Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir.1988).

- Second, we consider whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims. *Id*. at 195.

- Finally, we must assess the "hardship to the parties if judicial relief is denied at [this] stage" in the proceedings.  *Id*.; *see also Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162 (1967).

*Adult Video Ass'n v. U.S. Dept. of Justice*, 71 F.3d 563, 568 (6th Cir. 1995).  "[A] plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997).  While the injury need not be fully complete before the suit is filed, the injury must be almost certain to occur, mere speculation is insufficient. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 833 (6th Cir. 2001).  Disputes involving "contingent future events that may not occur as anticipated, or indeed may not occur at all" are not prone to declaratory relief.  *United Steelworkers v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir. 1998).

Here, Burnham's Contract provides for three separate $1 million bonuses.  (Doc. 27-16.) All three of the bonuses are predicated on the sale of the ENCAP or its "core-technology."  (*Id*.) The Contract states that the first bonus will be paid "immediately following" ENCAP's sale of its

10

core-technology.  (*Id.*)  Burnham is to receive the second bonus if, "at the sale of ENCAP's core-technology," his performance and productivity is deemed to be "worthy."  (*Id.*)  Similarly, the third bonus is to be paid, depending on Burnham's achievement of another performance metric, "immediately following the sale of ENCAP's core-technology."  (*Id.*)   It is clear from the Contract that Burnham's eligibility for all three bonuses is to be considered upon the sale of ENCAP or its "core-technology."

At this time, neither party has asserted facts indicating that ENCAP or its "core-technology" has been or is about to be sold.  To the contrary, it is entirely possible, based on the facts in the record, that ENCAP may never sell its "core-technology."  For this reason, the alleged harm—that Burnham will not receive the bonuses—is simply too speculative to be ripe. Additionally, it bears noting that the sale of ENCAP's "core-technology" triggers other obligations under the bonus provisions.  Upon that sale, for example, certain individuals must complete an assessment of Burnham's performance before he can receive the second bonus.  Any ruling as to Burnham's entitlement to the second bonus would therefore be only hypothetical—until such time as the performance assessment is complete and its results known.

The parties will not suffer any hardship from delaying this decision until Burnham's injury is more certain.  Burnham may bring a claim regarding the bonuses when ENCAP is sold or is about to be sold, and his denial of the bonuses is imminent.  Even if the Court were to enter a hypothetical ruling now, it is likely that the parties would have to re-litigate the issue again later when additional, relevant facts emerge upon the sale of ENCAP's core-technology.

Summary Judgment is **GRANTED** in favor of ENCAP on Burnham's breach-of-contract claim to the extent that it is based on his alleged entitlement to the three bonuses.

11

### 2. **Burnham's Claim that ENCAP Could not Terminate Him Without Cause**

Burnham also alleges that ENCAP breached the Contract by terminating his employment without cause.  (Doc. 3 at ¶ 18.)   ENCAP argues that Burnham was an at-will employee and was subject to termination without cause.  (Doc. 24 at 13.)

Ohio courts have held that "an employment contract will be presumed to be at-will unless there are 'facts and circumstances which indicate that the agreement is for a specific term.'" *Biskupich v. Westbay Manor Nursing Home*, 33 Ohio App. 3d 220, 221 (Ohio Ct. App. 1986) (quoting *Henkel v. Educational Research Council*, 45 Ohio St.2d 249 (Ohio 1976).  Under an at-will contract, an employer "may terminate the employment relationship for any reason which is not contrary to law."  *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 103 (Ohio 1985).  Ohio courts have further held that "[g]enerous promises of promotion and benefits for continued service are not in themselves inconsistent with an employment-at-will agreement which may be terminated by either party at any time for any reason."  *Smith v. St. Elizabeth Med. Ctr.*, 1986 Ohio App. LEXIS 8746, 11-12 (Ohio Ct. App. 1986).

The only reference to termination in the Contract appears in the bonus provision and states "in light of the fact that your position may very well terminate upon ENCAP's sale of its core-technology . . . ."  (Doc. 27-16 at § 5.)   This language is only a statement of Gist's expectation, at that time, that Burnham's employment *may* terminate upon sale of the "core-technology."  It cannot be reasonably construed as a guarantee of employment until the sale of the "core-technology."   No other language in the Contract defines the duration of employment or makes any reference to grounds for termination.  In sum, the Contract does not contain any specific terms that rebut the presumption that it provides for at-will employment.

12

Burnham does not directly address ENCAP's argument that it did not breach the Contract by terminating him without cause. Instead, Burnham refers to his termination only in the context of his claim for the bonuses—arguing principally that nothing in the Contract states that he must be employed by ENCAP to receive them. (Doc. 32 at 6.) Burnham cites Gist's affidavit for the proposition that he and Gist "assumed that he would be employed by ENCAP upon the sale of the company/CoForm" and "that his employment could only be terminated for cause . . . ." (*Id.* (citing Doc. 27-1 at ¶ 4).) Yet Burnham also concedes that the Contract "is silent as to whether his employment can be terminated without cause." (*Id.* at 6, n. 4.) The silence as to termination, under Ohio law, leads to the conclusion that the Contract is for at-will employment. *Biskupich*, 33 Ohio App. 3d at 221; *see also Triangle Properties, Inc. v. Homewood Corp.*, 2013-Ohio-3926, ¶ 21 (Ohio Ct. App. 2013) ("Where the terms are clear and unambiguous, a court need not go beyond the plain language of the instrument to determine the rights and obligations of the parties.")

Summary Judgment is **GRANTED** in favor of ENCAP on Burnham's claim that ENCAP breached the Contract by terminating him without cause.

### 3. **Burnham's Claim to Unpaid Compensation and Violation of Ohio Rev. Code § 4113.15**

Burnham alleges that ENCAP violated Chapter 4113 of the Ohio Revised Code by failing to pay his wages from June 30, 2012 through his termination on April 30, 2013. Under Ohio Rev. Code § 4113.15(A), an employer is required to pay its employees on a semi-monthly basis. The statute further provides that an employer that fails to pay an employee for more than thirty days beyond the regularly scheduled pay day is liable to that employee for six percent of the unpaid wages as liquidated damages—in addition to the employer's liability for the unpaid wages

13

themselves. Ohio Rev. Code § 4113.15(B).

ENCAP and Burnham agree that the total amount of unpaid compensation at issue is $66,119.90, after accounting for the three lump sum payments totaling $20,000 that ENCAP belatedly made to him. (Doc. 27 at 1; Doc. 29 at 8-9.) ENCAP does not dispute that Burnham is owed compensation for the period of his employment dating from June 30, 2012 to February 1, 2013. (Doc. 29 at 9; Doc. 31 at 5.) After February 1, 2013, ENCAP alleges that Burnham is not entitled to payment of his wages because he was a "faithless servant" under Ohio law. (Doc. 24 at 17-19; Doc. 29 at 8-9.) ENCAP therefore subtracts $16,869.90 from this amount—for the contested period of February 1, 2013 to April 30, 2013—and arrives at $49,250 in unpaid compensation that is owed to Burnham. (Doc. 29 at 9.)

The faithless servant doctrine is based on the agreement, implicit in an employment contract, that the "employee will act in good faith and will not act to the detriment of his employer." *Roberto v. Brown County General Hosp.*, 59 Ohio App.3d 84, 86 (Ohio Ct. App. 1989). Applying this doctrine, Ohio courts have held that "an employee cannot be compensated for his own deceit or wrongdoing." *Id.* An employee's compensation should be denied only for his "period of faithlessness," unless the employee's "dishonesty and disloyalty . . . permeates his service to his employer . . . ." *Id.* at 85-86 (citing *Bessman v. Bessman*, 214 Kan. 510, 520 (1974)).

ENCAP argues that Burnham's continued relationship with Gist was evidence of his disloyalty. (Doc. 31 at 6-8.) ENCAP further cites conversations between Gist, Lynch, and Burnham as evidence that Burnham was revealing ENCAP's business strategy, disparaging Elmore, and keeping Gist appraised of the situation at ENCAP. (*Id.* at 8.) Burnham argues that

14

he faithfully reported his communication with Gist to Elmore and that his interactions with Gist were extremely limited. He further argues that he did not disclose any confidential information and only discussed information Gist and Lynch knew or were authorized to know.

There are numerous, genuine disputes of material fact relating to whether or not Burnham acted as a faithless servant for the period from February 1, 2013 to April 30, 2013. Accordingly, neither party is entitled to summary judgment on Burnham's first claim for that period. The Court can rule, however, on ENCAP's liability for the earlier period, which is not in dispute. ENCAP is liable for payment of the $49,250 in unpaid compensation for the period from June 30, 2012 to February 1, 2013.

In addition to its liability for the $49,250 in unpaid compensation for that period, ENCAP is also liable for six percent of Burnham's *unpaid wages* for that period under Ohio Rev. Code § 4113.15(B).[2] The parties' memoranda, however, do not make clear how much of the $49,250 are unpaid wages and how much are other benefits. The Court is therefore unable to calculate the amount of the six percent of unpaid wages owed as liquidated damages at this time. The Court orders Burnham to submit a supplemental memorandum, no more than five pages, on this issue by no later than two weeks from entry of this Order. ENCAP may file a response, also no more than five pages, no later than seven days after service of Burnham's memorandum.

The Court **GRANTS** Burnham's Motion for Summary Judgment on his claim for unpaid wages and liquidated damages under Ohio Rev. Code § 4113.15(B), in an amount to be

---

[2] Section 4113.15(B) states that the six percent of unpaid wages is due as liquidated damages provided that "no contest[,] court order or dispute of any wage claim including the assertion of a counterclaim exists accounting for the nonpayment . . . ." Ohio Rev. Code § 4113.15(B). ENCAP's assertion of a Counterclaim does not bar recovery under § 4113.15(B) for the undisputed period because the allegations underlying the Counterclaim all relate to the later period in which Burnham is alleged to have been a faithless servant.

determined, for the period of June 30, 2012 to February 1, 2013. The Court **DENIES** Burnham's Motion for Summary Judgment as to his claim for payment of unpaid wages and liquidated damages for the period from February 1, 2013 to April 30, 2103.

## IV. <u>CONCLUSION</u>

ENCAP's Motion for Partial Summary Judgment (Doc. 24) and Burnham's Motion for Summary Judgment (Doc. 27) are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Summary judgment is **GRANTED** in ENCAP's favor (and **DENIED** as to Burnham) on Burnham's claim for payment of the three bonuses listed in his Contract with ENCAP;

2. Summary Judgment is **GRANTED** in ENCAP's favor (and **DENIED** as to Burnham) on Burnham's claim that ENCAP breached the Contract by terminating him without cause;

3. Summary Judgment is **GRANTED** in Burnham's favor on his claim that ENCAP is liable for failure to pay his wages and liquidated damages under Ohio Rev. Code § 4113.15(B) for the period from June 30, 2012 to February 1, 2013;[3]

4. Summary Judgment is **DENIED** as to ENCAP and Burnham on Burnham's claim that ENCAP is liable for failure to pay his wages and liquidated damages under Ohio Rev. Code § 4113.15(B) for the period from February 1, 2013 to April 30, 2013; and

5. Burnham is **ORDERED** to submit a supplemental memorandum of no more than five pages on the issue of what portion of the $49,250 in unpaid compensation for the period from June 30, 2012 to February 1, 2013 is unpaid wages. Burnham's supplemental memorandum is due no later than 14 days from entry of this Order. ENCAP may file a response, also no more than five pages, no later than seven days after service of Burnham's memorandum. No reply memorandum will be permitted without leave of court.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, July 18, 2016.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

[3] ENCAP did not move for summary judgment on this claim.